Commonwealth *v.* Gibson, Appellant.

Argued June 11, 1963. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Arthur Silverman,* with him *Ettinger, Gallagher & Silverman,* for appellant.

*Thomas M. Reed,* Assistant District Attorney, with him *Arlen Specter,* Assistant District Attorney, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY WATKINS, J., September 12, 1963:

George Gibson the defendant appellant was convicted of the burglary and larceny of a quantity of valuable drugs from the Upjohn Company. He appeals from the judgment of sentence by the Court of Quarter Sessions of Philadelphia County to a fine of $1000 and costs, a prison term in the Philadelphia County prison for not less than nine months nor more than twenty-three and one-half months and restitution; and from the denial by the court en banc below of motions in arrest of judgment and for a new trial.

The facts are well stated in the opinion of the court below, as follows:

"The Upjohn Company, a distributor of pharmaceuticals, has a warehouse and distribution center located in Philadelphia, at 401 North Broad Street where the Upjohn premises are located in the Northwest wing of the seventh floor. The premises occupy approximately 25,000 square feet, 5,500 square feet of which

is used for office space, the balance being used for warehouse space. The premises are under the protection of the Holmes Electric Protective Company from the close of business until the reopening for business the following day; they are not under the protection during the hours the premises are opened for business. None of the warehouse windows, of which there are approximately 70, were under the protection of this service.

"At the time of the alleged offenses there were 36 Upjohn inside employees. Among these, Vere J. Ranney was the Branch Office Manager; Richard Buck was the Shipping Superintendent; George Gibson (the defendant) was Shipping Supervisor; Walter Grudzinski and Thomas Boyle were Stock Control Clerks; Anna Ellis and Mary Thompson were office workers; and Louise Larson was clean-up woman.

"It was part of general office routine to conduct a daily inventory check of certain valuable drugs. The inventory check included the four valuable drugs alleged to be missing. These inventory checks for the general period in question were taken over alternate periods by Walter Grudzinski and Thomas Boyle. An inventory check of the valuable drugs was made on Friday, March 18, 1960 by Walter Grudzinski. It was completed before noon of that day. The Upjohn premises closed for business at 5:00 P.M. on Friday, March 18 and were not open for business again until the following Monday, March 21, 1960. The premises were closed on Saturday and Sunday, March 19 and 20. Mrs. Larson was the last employee known to be on the premises on Friday, March 18. She departed at approximated 6:20 P.M. at which time she 'closed the alarm' and thus put the Holmes Electric Protective System into operation. The system remained in operation continuously (except for a brief period of time on Saturday, March 19) from 6:20 P.M. on Friday until the premises were opened for business the following Monday morning.

"On Monday, March 21, 1960, shortly after 7:00 A.M., defendant opened the Upjohn premises. Shortly before 9:00 A.M., it was noticed by others that a battery operated bell on a rear door of the premises (the bell not being a part of the protective system hereinafter mentioned) was disconnected. This discovery prompted an immediate inventory and sales invoice check to be made of certain valuable drugs, after which it was concluded by the Upjohn management that the following quantities of drugs were missing from stock: 3 cases of Medrol, 4 milligram, 100 tablets per bottle; 3 cases Panalba, 250 milligram, 100 capsules per bottle; 1 case Medrol, 4 milligram, 1000 tablets per bottle; 8 plus cases of Unicap Therapeutic, 90 capsules per bottle. Such quantity of drugs had a wholesale value of approximately $19,000.00 and the combined total weight of the cases was about 370 pounds. The matter was reported to the Philadelphia police and after investigation the defendant was arrested and charged with the crimes of burglary, larceny, and receiving stolen goods.

"When the disconnection of the battery operated bell was noticed on Monday it was immediately thought advisable to conduct an inventory check of valuable drugs. The Upjohn Company had experienced a $90,-000.00 inventory loss of valuable drugs a couple years previous to the alleged $19,000.00 loss, which previous loss had been confined to the four drugs involved in the alleged $19,000.00 loss. Consequently, when the inventory check was ordered on Monday it was restricted to the four drugs: Medrol 500's, Panalba, Medrol 100's and Unicap Therapeutic. The four drugs were inventoried four different times on Monday. Boyle conducted the first inventory, Grudzinski the second and Buck inventoried the drugs in question the third and fourth times. The defendant did not participate in taking any of the four inventories. After the Mon-

day inventories were completed the head-count totals of the four drugs were compared with the head-count totals of the same four drugs as established by the previous Friday inventory taking, and the differences were considered to be the inventory movement, so-called, of each of the drugs. When the total inventory movement of each drug was established, Ranney supervised the pulling of the sales invoices for Monday, March 21. The total sales invoices of each of the four drugs were then deducted from the total inventory movement of each drug, and the Commonwealth contended the difference between the sales invoices of each drug and the inventory movement of each drug represented the quantity of drugs unaccounted for, missing, and stolen.

"The defendant was in the Upjohn premises for approximately 22 minutes early in the morning on Saturday, March 19. According to the defendant's account he entered the Upjohn premises that morning in response to a phone call purportedly received from the United States Navy Hospital, during which phone call he was requested to deliver 25 vials of 4 cc heparin sodium. (It was shown by the Commonwealth that such drug was not listed in the catalogue from which Navy personnel must order, and not approved for use.) After receiving the phone call the defendant telephoned the Holmes Electric Protective Company and advised of the need to enter the Upjohn premises for the purpose of filling an emergency ordered drug. Arrangements were made for a guard from the protective service to meet the defendant at 401 N. Broad Street. The defendant stated he then drove from his New Jersey residence to the Upjohn premises where he met the Holmes guard, Samuel R. Bryne. The defendant and Bryne entered the premises where Gibson remained approximately 22 minutes. At the time of entry the proper code signals were relayed to the Holmes office, and

when the defendant departed the premises he gave the necessary code signal to the Holmes office, and thus put the protective system back into operation.

"It is stipulated in the record that when the defendant departed the elevator after leaving the Upjohn premises he carried with him only the heparin sodium, and nothing else. He said he then transported the drug in his automobile to the hospital where he took it to the pharmacy department. He stated he made delivery of the drug to a Navy man on duty in the pharmacy and received from such person a receipt evidencing delivery of the drug, the receipt being signed 'N. L. Drum.' Mr. Drum was called to testify and denied receiving such drugs from the defendant at that time or at any other time."

The defendant contends the Commonwealth failed to prove the corpus delicti of the crimes charged. This is without merit. Corpus delicti, like any other factual matter, may be proved by circumstantial evidence. *Com. v. Smith*, 111 Pa. Superior Ct. 363, 170 A. 331 (1934); *Com. v. Saurbaugh*, 194 Pa. Superior Ct. 346, 168 A. 2d 638 (1961). It is sufficient if the circumstances are consistent with the crime even though they are also consistent with innocence. *Com. v. Kravitz*, 400 Pa. 198, 161 A. 2d 861 (1960).

As the court below points out: "The quantity and quality of proof required is no greater than for proof of any other matter by circumstantial evidence. The method of proof submitted by the Commonwealth to show the loss of these drugs has already been adverted to,—namely, proof of inventory movement minus total sales during the period from Friday to (and including) Monday. These are regular records kept by the Company and there would be no valid reason for expecting falsification. If any there was, it would be a matter of defense. None was shown.

"It is submitted that it was 'possible' that some of the inventory movement on Friday and Monday could

have included sales of these drugs made earlier in the week. Undoubtedly the jury took that into consideration, but felt that it was not a determining factor. If any considerable quantity of inventory movement on those two days, or, more correctly on parts of those two days, could be ascribed to 'back sales' who would be in a better position to know about it than the defendant himself, who was present both days, and who was Shipping Supervisor?"

In *Com. v. Kravitz*, supra, a homicide case, at page 211, the Supreme Court said: "He assigns as error the court's refusal of the fifth point of charge that the quality of circumstantial evidence must be 'such as to exclude every other reasonable possibility, except that of guilt.' The trial judge properly refused to so charge." And in the footnote on the same page: "This theoretical refinement, like the statement found in earlier cases, viz., that 'the facts and circumstances must be inconsistent with his innocence' was not only confusing to juries, but was illogical, unsound and irreconcilable with other decisions of the Court. At the suggestion of President Judge KELLER it was repudiated and abandoned by this Court." (Citing cases).

There was only one circumstance which might give rise to "the equally reasonable and mutually inconsistent inferences" as contemplated in *Com. v. Donald*, 192 Pa. Superior Ct. 276, 161 A. 2d 915 (1960), and *Com. v. New*, 354 Pa. 188, 47 A. 2d 450 (1946), and that was the telephone call. It could have come from someone desiring to cast suspicion upon the defendant but the defendant himself described the person to whom he said he made delivery. This person, Norbert L. Drum, denied ever receiving delivery, so that is where the possible inconsistency must end. The jury could well infer that the defendant lied concerning the time he was alone on the premises; that it was possible in that time to carry out the material involved to a point

beyond the protected area where it could later be removed. And as the court below said: "Defendant complains that the Commonwealth has not negatived all other possible and consistent inferences that might be drawn from defendant's account. The answer is simply that they are not reasonable inferences. A point was made that there are over 70 windows which were unprotected by the Holmes Electric Company system. The Commonwealth showed that none of these windows had been tampered with in any way. There were no marks; the dust on the sills and elsewhere was undisturbed. The windows were 12 to 15 feet above the nearest roof where access could have been made. The only reasonable inference is that the defendant, or his accomplices, if any, removed the cases of drugs either Saturday, following the delivery of the emergency order, or Sunday.

"Again, defendant argues that for several hours on Friday, March 18, the Upjohn Company premises were open for business after the inventory was taken on the four valuable drugs, and likewise on Monday morning for 1½ hours before the inventory was again taken. There were many employees on the premises. Other individuals came in to conduct business. Could not any of them have removed these cases of drugs? The jury must have answered this question in the negative. It is not reasonable to infer that about 15 cases of valuable drugs, weighing from 350 to 370 pounds, could have been so removed without the knowledge of those there in authority during that time, or detection by them. We think the jury had every right to so conclude." The evidence was sufficient to sustain the conviction.

The contention of the defendant that it was trial error to admit the testimony of the supervisor of the telephone exchange is without merit. It didn't matter where the call came from under the circumstances in this case as the drug was delivered to the hospital but

payment was refused on the ground it was never ordered. The admission of the testimony concerning the call could not possibly prejudice the defendant's case.

This is also true of the oral testimony concerning the sales that required the use of the I B M machine equipment which the court below properly disposed of as follows: "All of these invoices were extant and available for inspection to defendant before and at the time of the court trial, as well as the I B M equipment. Furthermore, Mr. Ranney had already testified at length concerning the matters complained of, without objection and had fully covered the subject of losses, types of drugs missing, value of same, etc., 'by running the I B M cards'. No objection was entered until the subject of sales invoices was broached. Even then, no motion to strike any of the testimony was made. Under the circumstances, we feel there was no error, and defendant was not prejudiced by the court's ruling."

The defendant further contends that the court committed reversible error in excluding the offer of proof of the defendant's reputation as to truthfulness. The evidence should have been admitted. "Character for truth is always and everywhere admissible." Wigmore on Evidence, Vol. III, 922. But under the circumstances in this case the rejection of the testimony was harmless error.

As we said in *Com. v. Zeger*, 193 Pa. Superior Ct. 498, 505, 165 A. 2d 683 (1960) : "Reputation evidence as proof of good character, generally, or a trait or a group of traits of good character of a defendant in a criminal case, if relevant, is admissible as an exception to the hearsay rule. The test is whether such evidence of good character is relevant. Evidence of good character is always relevant and admissible for the defendant in a criminal case where it becomes substantive evidence that may tend to rebut the Commonwealth's burden of proof of essential mens rea. But its rele-

vancy may be limited to the particular trait or traits of character involved in the commission of the crime charged."

In this case, unlike the *Zeger* case, the defendant had the benefit of eleven character witnesses as to his reputation for honesty and for being a law abiding citizen, which most certainly are the relevant traits of character when charged with burglary and larceny, and we agree with the court below that the "common usage of the word honesty renders it almost synonymous with truthfulness." As we said in *Com. v. Pressel,* 194 Pa. Superior Ct. 367, 370, 168 A. 2d 779 (1961), "Truth or veracity is a trait of the man of integrity or honesty; it is never the trait of the thief or robber. The reputation for dishonesty or criminal conduct is, we think, utterly inconsistent with a good reputation for truth and veracity." The court very carefully and emphatically, in his charge, pointed out the importance of character evidence; that it was substantive and not a mere makeweight; and in and of itself, without anything more, may produce a reasonable doubt of a conclusion of innocence. In the *Zeger* case the defendant was denied all character testimony and his credibility was the chief issue in the case; and truthfulness the only trait of character involved.

Judgment of sentence affirmed, and it is ordered that the defendant appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal was made a supersedeas.