J-S40034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DAIVON HEYWARD, | : | |
| | : | |
| Appellant | : | No. 1408 EDA 2015 |

Appeal from the Judgment of Sentence January 8, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0012398-2013

BEFORE: BOWES, MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED JULY 22, 2016**

Daivon Heyward ("Heyward") appeals from the judgment of sentence entered following his conviction of first-degree murder, carrying a firearm without a license, carrying a firearm on public streets, and possessing an instrument of crime ("PIC").[1] We affirm.

In its November 4, 2015 Opinion, the trial court provided a comprehensive summary of the factual and procedural history underlying the instant appeal, and the evidence presented at trial, which we adopt for the purpose of this appeal. *See* Trial Court Opinion, 11/4/15, at 1-20.

On appeal, Heyward presents the following claims for our review:

I. Is [Heyward] entitled to an arrest of judgment with regard to his convictions for first[-]degree murder, carrying a firearm without a license, carrying a firearm on public streets and [PIC,] since the evidence is insufficient to sustain the verdicts of guilt as the Commonwealth failed to sustain its burden of proving [Heyward's] guilt beyond a reasonable doubt?

---

[1] 18 Pa.C.S.A. §§ 2502, 6106, 6108, 907.

II. Is [Heyward] entitled to a new trial with regard to his convictions for first[-]degree murder, carrying a firearm without a license, carrying a firearm on public streets and [PIC,] since the verdicts of guilt are against the weight of the evidence?

III. Is [Heyward] entitled to a new trial as a result of the trial court's error in allowing the Commonwealth to present testimony with regard to [Heyward's] and others['] alleged extortion of money from Commonwealth witness Kyron Shorter ["Shorter"]?

IV. Is [Heyward] entitled to a new trial as a result of the trial court's ruling that limited the defense cross-examination of Commonwealth witness [Shorter] with regard to his preliminary hearing testimony and his statements to detectives?

V. Is [Heyward] entitled to a new trial as a result of the trial court's ruling that denied a [M]otion for a mistrial made as the result of the trial court's permitting the Commonwealth to present out[-]of[-]court statements made by [Shorter] to [Philadelphia] Police Officer Anthony Comitalo ["Officer Comitalo"]?

VI. Is [Heyward] entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to present the testimony of Commonwealth witness[,] Detective Frank Mullen [("Detective Mullen"),] to narrate a videotape recording?

VII. Is [Heyward] entitled to a new trial as a result of the trial court's ruling that denied [Heyward's] request for a jury instruction on voluntary manslaughter?

Brief for Appellant at 6-7.

Heyward first challenges the sufficiency of the evidence underlying his convictions. *Id.* at 37. Heyward contends that the Commonwealth's case was primarily based upon the testimony of Shorter, Shahere Jackson-McDonald ("Jackson-McDonald") and cell phone records. *Id.* Heyward asserts that the Commonwealth's evidence failed to identify him as the

shooter or as a participant in the incident. *Id.* Heyward further asserts that the Commonwealth's evidence was speculative, as the Commonwealth's witnesses were not in a position to see the perpetrator of the shooting, the clothing worn by the shooter, or the shooter's facial features and physical characteristics. *Id.* at 37-38. As a result, Heyward argues, the witnesses' descriptions were "inadequate, incomplete or inapplicable." *Id.*

Regarding the physical evidence, Heyward contends that the Commonwealth's ballistics evidence was contradicted by the identifying witnesses, and that Heyward is not depicted in the videotaped evidence. *Id.* Even if the Commonwealth had presented evidence that he was involved in the incident, Heyward argues, the Commonwealth failed to establish the intent necessary to sustain his convictions. *Id.*

In its Opinion, the trial court set forth the appropriate standard of review, addressed the sufficiency of the evidence underlying Heyward's conviction of first-degree murder, and concluded that the claim lacks merit. *See* Trial Court Opinion, 11/4/15, at 21-23. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on the basis of its Opinion with regard to Heyward's first claim.[2] *See id.*

---

[2] As to Heyward's convictions for carrying a firearm without a license, carrying a firearm on public streets, and PIC, Heyward identified no element, other than the identification of him as the assailant, that the Commonwealth failed to establish. Based upon our rejection of his challenge to the identification evidence, we conclude that any challenge to the sufficiency of the evidence underlying Heyward's remaining convictions lacks merit.

Heyward next claims that the verdict is against the weight of the evidence.[3] Brief for Appellant at 47. Heyward argues that the Commonwealth failed to prove the essential elements of the crimes charged beyond a reasonable doubt. *Id.* at 49. Again, Heyward asserts that the identifying witnesses were not in a position to identify the perpetrator; the descriptions given by the witnesses were inadequate; and surveillance video did not show Heyward to be present at the crime scene. *Id.* Heyward challenges the Commonwealth's presentation of cellular telephone records, as the records show only that he was using the phone at the time of the shooting, and no witness testified that the shooter was using a phone. *Id.* Heyward additionally contends that the Commonwealth presented no physical or scientific evidence connecting him to the shooting, except for inconsequential DNA evidence. *Id.* at 50. Further, Heyward states that the location of ballistics evidence contradicted the testimony of the eyewitnesses. *Id.* Finally, Heyward argues that the Commonwealth failed to prove that he had the requisite specific intent to kill the victim. *Id.* at 49, 51.

"The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the

---

[3] Heyward properly preserved his claim in his post-sentence Motion. *See* Pa.R.Crim.P. 607(a)(1)-(3) (providing that a challenge to the weight of the evidence must be raised "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion.").

sound discretion of the trial court." ***Commonwealth v. Cash***, 2016 Pa. LEXIS 1081, *13-14 (Pa. May 25, 2016).

> Thus, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence.  An appellate court may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim.  Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice.

***Id.*** at *14 (internal citations and quotation marks omitted).

In its Opinion, the trial court set forth a comprehensive analysis of Heyward's claim, and ultimately concluded that it lacks merit.  ***See*** Trial Court Opinion, 11/4/15, at 26-28.  We discern no abuse of discretion in the trial court's denial of Heyward's claim.  Accordingly, we affirm on the basis of the trial court's Opinion with regard to Heyward's second claim.  ***See id.***

In his third claim, Heyward argues that the trial court improperly permitted the Commonwealth to present testimony that after the shooting, he and others had attempted to extort money from Shorter, a Commonwealth witness.  Brief for Appellant at 53.  According to Heyward, the trial court previously had ruled that testimony concerning the extortion attempts was not admissible, unless Heyward "opened the door" for such testimony.  ***Id.*** at 54.  At trial, however, the trial court permitted Shorter to testify that his two-month delay in reporting the murder was caused by the extortion attempts.  ***Id.***  Heyward disagrees that such testimony was

necessary to explain Shorter's delay in reporting his observations to the police. *Id.* Heyward contends that any connection is pure speculation, and, in any event, would constitute "reverse extortion," because "the individual who allegedly [had] witnessed a crime is the one paying the money, rather than the individual who was involved in the shooting." *Id.* at 55.

Heyward's claim implicates the admissibility of evidence. The admissibility of evidence rests within the sound discretion of the trial court, and therefore, we "will reverse [the] trial court's decision … only if the appellant sustains the 'heavy burden' to show that the trial court has abused its discretion." *Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015) (citation omitted).

> It is not sufficient to persuade the appellate court that it might have reached a different conclusion[;] it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion [that] overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Id.* (citation omitted).

In its Opinion, the trial court addressed Heyward's challenge to the admissibility of evidence related to the attempted extortion, and concluded that the claim lacks merit. *See* Trial Court Opinion, 10/4/15, at 28-30. We agree with the sound reasoning and conclusion reached by the trial court, and affirm on this basis, with the following addendum. *See id.*

- 6 -

In his brief, Heyward avers that the evidence related to the attempted extortion of Shorter "is akin to permitting the Commonwealth to present testimony concerning unrelated criminal activity." Brief for Appellant at 55.

Only relevant evidence is admissible at trial. Pa.R.E. 402. Evidence is relevant if it tends to make a material fact more or less probable than it would be without the evidence. Pa.R.E. 401. Relevant evidence may be excluded, however, if its probative value is outweighed by unfair prejudice. Pa.R.E. 403.

Pennsylvania Rule of Evidence 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). "In addition, the Pennsylvania Supreme Court has recognized a *res gestae* exception to Rule 404(b)[,] which allows admission of other crimes evidence when relevant to furnish the context or complete story of the events surrounding a crime." ***Commonwealth v. Dillon***, 925 A.2d 131, 136-37 (Pa. 2007); ***see also Commonwealth v. Lark***, 543 A.2d 491, 497 (Pa. 1988) (recognizing that evidence of other crimes, while generally not

admissible solely to show criminal propensity, may be admissible in special circumstances, where it is relevant for some other legitimate purpose; one special circumstance is the "*res gestae*" exception, where such evidence became part of the history of case and formed a part of the natural development of the facts).

Shorter testified at trial that, upon witnessing the shooting, he ran to the home of his girlfriend. N.T., 10/28/14, at 134. Shorter stated that he did not call 911, because he was scared. *Id.* According to Shorter, he next encountered Heyward at a "Chinese store," at which time Heyward told Shorter that he "had to give up some money in order to stay around there." *Id.* at 137, 141. Shorter understood Heyward's comment to mean that "I had to give up some money to stay around there 'cause I was the only one going around the neighborhood saying what I saw." *Id.* at 141. During his testimony, Shorter acknowledged that he was trying to sell marijuana in the area, and that Heyward's comment pertained to Shorter's statements regarding the shooting, and his intention to sell marijuana. *Id.* at 142-43.

Shorter testified that a man named Keith, who knew both Shorter and Heyward, subsequently approached Shorter. *Id.* at 143-45. After that encounter, Shorter stated, he told his girlfriend and then the police about the shooting. *Id.* at 145.

During cross-examination, defense counsel questioned Shorter about his preliminary hearing testimony regarding the money sought by Keith and Heyward:

**Q.** [The Commonwealth:] Next question [from the preliminary hearing transcript].

Was there a dollar amount?

Do you remember that?

**A.** [Shorter:] Yes.

**Q.** And what was the dollar amount?

**A.** Initially they said 12 hundred.

**Q.** Initially they said 12 hundred.

You were asked on page 29, … was there any dollar amount ever talked about? Five hundred or two thousand? Was there a dollar amount talked about in terms of what you had to give this man?

Your answer. Four hundred and fifty dollars.

Question. Four hundred fifty?

Answer. Four hundred and fifty.

Question. I'm sorry. Did you tell that to the detective when you gave the statement on the 11th?

Your answer. I believe so.

You [re]call being asked that question and giving those answers, sir?

**A.** Yes.

**Q.** Did you tell the detective that the amount of money was four hundred and fifty dollars?

**A.** No. Not initially.

**Q.** At any time did you tell the detective that the amount of money was four hundred and fifty dollars?

**A.** Yes.

**Q.** And he wrote it down in your statement?

**A.** Yes.

**Q.** You have your statement in front of you?

**A.** (No response).

**Q.** [The Commonwealth:] Could we direct the witness to page three, first full question and answer?

**Q.** [Defense counsel:] … First question. You see that first question, how much money did Keith tell you he wanted?

**A.** Yes.

**Q.** All right. And what did you tell the detective?

**A.** 12 hundred.

**Q.** Is there any mention of four hundred fifty dollars in that statement?

**A.** No.

*Id.* at 183-85.

The testimony now challenged by Heyward was elicited during redirect examination, when the Commonwealth asked Shorter to clarify his testimony regarding the amount of money requested by Keith and Heyward:

**Q.** [The Commonwealth:] … [Defense c]ounsel asked you the question about the amount of money that you were asked to give up.

- 10 -

You said initially your testimony to us and what we heard in the preliminary hearing was 12 hundred dollars. That's what you told the detectives; right?

**A.** [Shorter:] Yes.

**Q.** Did you also go on in September to describe to the detective when you were talking about Keith, that Keith said he wanted five hundred on Friday, and the rest another time?

**A.** Yes.

**Q.** This was on September 11th, 2013.

After September 11th, 2013[,] did you have contact with Keith prior to coming to the preliminary hearing?

**A.** I had a phone call.

**Q.** And was money discussed on the phone call by Keith?

[Defense counsel:] Objection, Your Honor.

THE COURT: Overruled.

**A.** [Shorter:] Yes.

…

**Q.** [The Commonwealth:] And what did he say?

**A.** I told him I didn't have the money, I had to do something with my kids, and he said knock the fifty dollars off and that's where the four fifty came in at.

*Id.* at 197-98.

Contrary to the assertions of Heyward, this testimony was relevant to explain the discrepancies in Shorter's testimony, pointed out during cross-examination, and to describe the chain of events. Under these

- 11 -

circumstances, we discern no abuse of discretion by the trial court in admitting this testimony. *See Dillon*, 985 A.2d at 136-37.

In his fourth claim, Heyward argues that the trial court improperly limited the cross-examination of Shorter with regard to his preliminary hearing testimony and his statements to the detectives. Brief for Appellant at 56. Heyward argues that he was entitled to cross-examine Shorter about the extortion attempts, and that the trial court's restriction infringed on his confrontation rights under the Sixth Amendment to the United States Constitution.[4] *Id.*

Pennsylvania Rule of Evidence 611(b) addresses the scope of cross-examination, providing as follows: "Cross-examination of a witness other than a party in a civil case should be limited to the subject matter of the direct examination and matters affecting credibility; however, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Pa.R.E. 611(b). "The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *Commonwealth v. Ballard*, 80 A.3d 380, 394 (Pa. 2013) (citation omitted).

In its Opinion, the trial court addressed Heyward's claim, and concluded that it lacks merit. *See* Trial Court Opinion, 11/4/15, at 30-32.

---

[4] The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const., amend. VI.

We agree with the sound reasoning of the trial court regarding this claim, as set forth in its Opinion, and affirm on this basis. ***See id.***

In his fifth claim, Heyward argues that the trial court improperly denied his Motion for a mistrial, based upon the admission of out-of-court statements made by Shorter to Officer Comitalo. Brief for Appellant at 59. Heyward contends that the statements constituted inadmissible hearsay, subject to no exception. ***Id.*** Further, Heyward argues, the trial court's cautionary instruction did not cure the prejudice resulting from the admission of Shorter's out-of-court statements. ***Id.*** at 60.

A motion for a mistrial is within the discretion of the trial court. ***Commonwealth v. Stafford***, 749 A.2d 489, 500 (Pa. Super. 2000). "[A] mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." ***Commonwealth v. Lease***, 703 A.2d 506, 508 (Pa. Super. 1997). However, a mistrial "is not necessary where cautionary instructions are adequate to overcome prejudice." ***Commonwealth v. Chamberlain***, 30 A.3d 381, 422 (Pa. 2011). On appeal, our standard of review is whether the trial court abused its discretion in denying a mistrial. ***Stafford***, 749 A.2d at 500.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c); ***Commonwealth v. McCrae***, 832 A.2d

1026, 1034 (Pa. 2003). Rule of Evidence 802 provides that, "[h]earsay is not admissible except as provided by these rules [the Rules of Evidence], other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802; *accord Commonwealth v. Johnson*, 107 A.3d 52, 82 (Pa. 2014) (citation omitted).

Our review of the record discloses that at trial, the Commonwealth questioned Officer Comitalo about the events that transpired on September 11, 2013, the day Shorter informed the police that he had witnessed the shooting. N.T., 10/29/14, at 115. Officer Comitalo testified that he had been called to the area of Ogontz and Olney Avenues, where he and other officers met with Shorter. *Id.* At that time, Officer Comitalo asked Shorter for the identity of the person who had been threatening him with a gun. *Id.* at 115-16. According to Officer Comitalo, Shorter replied that there were at least two males in a newer model Jeep Cherokee. *Id.* at 116. Officer Comitalo indicated that Shorter then voluntarily accompanied police back to their station. *Id.* At issue is the following testimony by Officer Comitalo:

> **Q.** [The Commonwealth:] And do you remember—[w]hat did [Shorter] tell you? Did he tell you about anything in particular when you went back to the district?
>
> **A.** [Officer Comitalo:] Yeah. He had—[h]e mentioned he had details about a murder that occurred in the 14th District.
>
> The male that was in the Cherokee was—
>
> [**Defense counsel**:] Objection.
>
> **THE COURT**: Let me see counsel at sidebar.

- 14 -

(A sidebar discussion was held off the record.)

**THE COURT**:  The objection is overruled and you may resume.

**By** [**The Commonwealth**]

**Q.**  …  [F]irst, I want to direct your attention to why [] Shorter called the police and had asked for help that day in terms of the Cherokee.

Did he tell you who was in the Cherokee and what that person had either said to him or did to him?

**A.**  Initially at location, no, but eventually, yes.

**Q.** And what did he say about that individual?

[**Defense counsel**:] I would object.

**THE COURT**:  Overruled.

**THE WITNESS**:  He said that it was a male that he knew by the name of Dai and he was—

[**Defense counsel**:]  Objection.

[**The Commonwealth**:] If I can, I will give the officer his interview.

Did he tell you basically—Let me clarify.

[**Defense Counsel**:] I move for a mistrial.

*Id.* at 116-18.

The trial court denied the Motion for a mistrial, but offered to issue a cautionary instruction:

**THE COURT**:   Well, I'm prepared to deny your [M]otion for mistrial.

- 15 -

What I would do is give the following cautionary instruction.

There's no evidence that anyone in the Jeep Cherokee had or showed a gun on September 11th when [] Shorter spoke with Officer Comitalo.

[**Defense counsel**]: Reflecting back on [] Shorter's testimony, he said there were two incidents. First as to [Heyward], my client, at the Chinese store. Second incident involved Keith, that was my understanding, alone.

THE COURT: That's what I understood.

…

[**Defense counsel]**: And now you have this incident of [Heyward], Keith and a third male inside the vehicle with an inference that, you know, there might be a weapon involved.

And my request would be that in addition to that that there is no evidence that [Heyward] was present in that vehicle.

It needs to be clear, Judge.

THE COURT: Okay.

…

THE COURT: I'll complete the cautionary instruction with also there is no evidence that [Heyward] was present in the Jeep Cherokee.

*Id.* at 127-28. When court resumed, the trial court gave the following

cautionary instruction to the jury:

Before we proceed further, ladies and gentlemen, I just need to tell you there is no evidence that anyone in the Jeep Cherokee had or showed a gun on September 11th[,] when [] Shorter spoke with Officer Comitalo.

Also[,] there is no evidence that [Heyward] was present in the Jeep Cherokee.

- 16 -

*Id.* at 128-29. Defense counsel did not object to the cautionary instruction.

Upon review, we cannot conclude that the trial court abused its discretion by denying Heyward's Motion for a mistrial. The trial court's cautionary instruction alleviated any prejudice caused by Officer Comitalo's testimony. *See Commonwealth v. Lopez*, 57 A.3d 74, 85 (Pa. Super. 2012) (stating that a jury is presumed to follow the instructions of the trial court). Accordingly, we cannot grant Heyward relief on this claim.

In his sixth claim, Heyward argues that the trial court improperly permitted Detective Mullen, a Commonwealth witness, to narrate a video recording shown to the jury. Brief for Appellant at 62. Heyward contends that Detective Mullen's narration invaded the fact-finding province of the jury. *Id.* at 63. According to Heyward, Detective Mullen narrated the actions of "key Commonwealth witness [] Jackson-McDonald, who claimed to be an eyewitness to the shooting." *Id.* at 64. Heyward asserts that as an eyewitness, Jackson-McDonald's position and her ability to observe were key facts. *Id.* Heyward contends that the jury could easily determine for itself the actions and position of Jackson-McDonald, and Detective Mullen's narration invaded the jury's fact-finding function. *Id.* Finally, Heyward points out that Detective Mullen was not qualified as an expert witness, nor did he possess any special knowledge or training upon which he could rely in rendering an opinion. *Id.*

In its Opinion, the trial court addressed this claim and concluded that it lacks merit. *See* Trial Court Opinion, 11/4/15, at 34-35. We agree with the sound reasoning of the trial court, and discern no abuse of discretion or error in the admission of Detective Mullen's testimony. *See id.* We therefore affirm on the basis of the trial court's Opinion with regard to Heyward's sixth claim. *See id.*

In his seventh claim, Heyward argues that the trial court improperly failed to instruct the jury on voluntary manslaughter. Brief for Appellant at 66. Heyward directs our attention to the testimony of Ditavious Smith ("Ditavious"), who stated that the victim, his nephew, was in a relationship with Heyward's mother. *Id.* at 67. Ditavious further testified that he had heard of problems between the victim and Heyward's mother, and that the victim previously had assaulted Heyward. *Id.*

Heyward also directs our attention to the testimony of Joann Smith ("Joann"), who provided a statement to police that the victim had beaten Heyward's mother. *Id.* Joann additionally testified that she had heard of the beating in the neighborhood. *Id.* Heyward contends that "[t]he jury could have concluded that this relationship had an impact on [Heyward] that drove him to seek out the victim and shoot him, thereby supporting a voluntary manslaughter instruction. *Id.* at 68.

In its Opinion, the trial court addressed this claim and concluded that it lacks merit. *See* Trial Court Opinion, 11/4/14, at 23-26. We agree with

and affirm the trial court's resolution of this claim based upon the reasoning set forth in its Opinion.  **See id.**

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/22/2016

IN THE COURT OF COMMON PLEAS

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF :      CP- 51-CR-0012398-2013

PENNSYLVANIA :



CP-51-CR-0012398-2013 Comm. v. Heyward, Daivon
Opinion

7365917501

vs. :

FILED

NOV 4 2015

Criminal Appeals Unit
First Judicial District of PA

DAIVON HEYWARD :

:      SUPERIOR COURT

:      NO. 1408 EDA 2015

OPINION

GEROFF, J.                 NOVEMBER 4, 2015

On November 3, 2014, after a jury trial, the Defendant, Daivon Heyward, was convicted of murder of the first degree, carrying a firearm without a license, carrying a firearm on public streets, and possessing an instrument of crime. (N.T. 11/03/2014, pp. 4-8). On January 8, 2015, this court sentenced Defendant to a term of imprisonment of life without parole on the conviction of murder of the first degree. (N.T. 01/08/2015, p. 17). Following the recommendation of the Commonwealth, this court imposed no further sentence on the remaining three

convictions. (N.T. 01/08/2015, pp. 7-8, 17).  On June 10, 2015, counsel for the Defendant filed a timely notice of appeal pursuant to Pa. R. App. P. § 1925 (b).

In his Statement of Matters Complained of on Appeal, the Defendant raises seven (7) issues. Defendant claims: (1) the evidence was insufficient to prove beyond a reasonable doubt that Defendant was the perpetrator; (2) the verdict was against the weight of the evidence; (3) the trial court erred when it allowed testimony that Defendant and another man had attempted, on two occasions to extort money from Kyron Shorter, an eyewitness to this crime; (4) the trial court erred in limiting the Defendant's opportunity to cross-examine Kyron Shorter regarding his testimony at the preliminary hearing and his statement to detectives; (5) the trial court erred in denying Defendant's motion for a mistrial when the Commonwealth presented testimony about statements made by Kyron Shorter to Police Officer Anthony Comitalo, as that testimony was hearsay without an exception; (6) the trial court erred when it allowed Detective Frank Mullen to narrate video surveillance which was played in court before the jury, such error usurping from the jury its duty as the sole arbiter of factual determinations; and (7) the trial court erred when it denied Defendant's request for a jury instruction of voluntary manslaughter.

## THE EVIDENCE

The evidence adduced at trial established that during the late night hours of July 17, 2013 into the early morning hours of July 18, 2013, Gregory Smith suffered three gunshot wounds in the Germantown section of the city near the corner of Wister Street and Germantown Avenue. [N.T. 10/28/2014, pp. 107-15, 125-27, 129-31].  As a result of the wounds sustained, Gregory Smith was pronounced dead on the scene by medical assistance units at 12:32 am. [N.T. 10/29/2014, pp. 55-60].  Daivon Heyward was identified as the shooter by two identifying witnesses. [N.T. 10/28/2014, pp. 125-27, 129-34]; [N.T. 10/29/2014, pp. 78-83].

2 | P a g e

## Eyewitness Testimony

Kyron Shorter testified at trial as an eyewitness to the murder. [N.T. 10/28/2014, pp. 123-200]. Mr. Shorter testified that he had been living in the Germantown area of the city for roughly five years preceding the day of the murder. [N.T. 10/28/2014, pp. 123-24]. On the night in question, Mr. Shorter was walking up Germantown Avenue from the Logan Street intersection toward Wister Street to buy marijuana. [N.T. 10/28/2014, pp. 125-27]. As Mr. Shorter passed the Reger Street alley but before he reached Wister Street, Mr. Shorter saw the Defendant at the intersection just above Wister Street and Germantown Avenue—Manheim Avenue and Germantown Avenue—crossing over Germantown Avenue toward the Wister Street Plaza.[1] [N.T. 10/28/2014, pp. 125-28, 156-]. Mr. Shorter saw Defendant cross Germantown Avenue toward the Wister Street Plaza where the decedent, Gregory Smith, was standing. [N.T. 10/28/2014, pp. 127-31].

Mr. Shorter testified that the decedent said something to the Defendant as the Defendant approached him, but Mr. Shorter could not hear what was said. [N.T. 10/28/2014, pp. 130-31]. Mr. Shorter testified that after the decedent communicated with the Defendant, he turned and walked away from the Defendant down Germantown Avenue and turned onto Wister Street. [N.T. 10/28/2014, p. 131]. Mr. Shorter testified that the Defendant came up behind the decedent and shot him twice. [N.T. 10/28/2014, pp. 131-32]. Mr. Shorter then saw the Defendant run away from the crime scene through a breezeway for the Wister Street Plaza. [N.T. 10/28/2014, pp. 131-33]. Mr. Shorter testified that the Defendant returned to the scene of the crime and fired three more shots while the decedent was on the ground and was "twitch[ing]." [N.T. 10/28/2014, pp.

---

[1] The Wister Street Plaza is strip mall of shops. The plaza's parking lot is separated from the sidewalk by a wall. According to Kyron Shorter, the decedent, Gregory Smith, was standing near the wall of the Wister Street Plaza before he and the Defendant interacted. [N.T. 10/28/2014, pp. 129-31].

131-33]. Mr. Shorter saw the Defendant run back through the same breezeway of the Wister Street Plaza toward a broken section of a fence in the rear of the parking lot which led to Collum Street. [N.T. 10/28/2014, pp. 133].

Mr. Shorter testified that he never told the police or the mother of his child, with whom he lives, about what he saw that night. [N.T. 10/28/2014, pp. 127-31]. A week after the murder, Mr. Shorter saw the Defendant at a Chinese restaurant near the intersection of Germantown Avenue and Seymour Street. [N.T. 10/28/2014, pp. 137-38]. According to Mr. Shorter, the Defendant told Mr. Shorter that he could not stay in the neighborhood unless he paid the Defendant the sum of $1,200.00. [N.T. 10/28/2014, pp. 136-43, 183-84]. Mr. Shorter stated that the reason for the extortion was two-fold: (1) Defendant believed Mr. Shorter to be a "law-abiding citizen"[2] because Mr. Shorter was telling people in the neighborhood what he had seen that night; and (2) the money was a license for Mr. Shorter to continue to sell marijuana in the neighborhood. [N.T. 10/28/2014, pp. 142-43].

On September 11, 2013, Mr. Shorter was near the corner of Seymour Street and Germantown Avenue when an acquaintance of the Defendant, a person by the name of Keith, approached him and demanded the sum of four hundred and fifty dollars. [N.T. 10/28/2014, pp. 143-45, 183-84]; see also [N.T. 10/28/2014, pp. 203-05]. Keith stated that the money was payment so that Mr. Shorter could stay in the neighborhood because he was a "rat." [N.T. 10/28/2014, pp.

---

[2] Mr. Shorter elaborated on this phrase through the following testimony on direct examination:

> Q: When you used the term at the preliminary hearing law abiding citizen, do you mean the way we commonly think of, meaning that you hadn't committed any crimes?
> . . .
> A: Basically I was saying something that I saw.
> Q: Meaning you saw a shooting where a man died?
> That's what you were referring to?
> A: Yes.

[N.T. 10/28/2014, pp. 152-53].

143-44]. The same day that this exchange with Keith occurred, Mr. Shorter called the police and had plainclothes officers pick him up on a different street so that no one in the neighborhood would see Mr. Shorter entering a police cruiser. [N.T. 10/28/2014, pp. 145-47].

On that day, Mr. Shorter gave a statement to homicide detectives detailing what he had seen on July 18, 2013.[3] [N.T. 10/28/2014, pp. 147-56]. Roughly a month after his statement, Mr. Shorter testified at the preliminary hearing and again identified the Defendant, a person whom he knew from the neighborhood since roughly 2010. [N.T. 10/28/2014, pp. 148-50].

During cross-examination, Defendant's counsel questioned Mr. Shorter about inconsistencies between his testimony at trial, his testimony from the preliminary hearing, and his statement to detectives.[4] First, counsel questioned Mr. Shorter about where he was standing when the shooting took place. [N.T. 10/28/2014, pp. 160-65]. The following exchange occurred during cross examination:

Q: Your testimony is you were on the corner of the alleyway [Reger Street] and Germantown at the time of the shooting?

A: No. I said I was a little bit up from the alleyway.

Q: To the left or to the right?

A: To the left.

Q: How far?

A: Where the Metro store is [sic].

---

[3] Each page of Mr. Shorter's statement was initialed. Mr. Shorter also signed a Statement of Adoption and Attestation. During the interview, Mr. Shorter identified both the Defendant and Keith from two separate photo arrays. [N.T. 10/28/2014, pp. 147-48].

[4] At the heart of Defendant's fourth issue is Defendant's claim that he was denied a fair and full opportunity to cross-examine Mr. Shorter regarding some discrepancies involving his trial testimony, preliminary hearing testimony, and statement to homicide detectives. [N.T. 10/28/2014, pp. 191-92 203-05]. This Court is forced to place the whole line of skewed questioning into focus to explain why the Court sustained the objection, ending counsel's line of questioning.

Q: Where the Metro store is at [sic]?

A: Yes.

Q: Where is the Metro store in relation to this?

A: Right before Wister Street corner. It's like right at the Wister Street corner.

. . .

Q: So my question is when you were questioned by the Prosecutor as to where you were on direct examination, you say you were at Germantown Avenue and Reger Street, which one is it, Germantown Avenue and Reger or Germantown Avenue and Wister?

A: A little bit up from Reger on [Germantown] Avenue on the opposite side of Wister. That's what I said.

[N.T. 10/28/2014, pp. 160-61]. Defendant's counsel also questioned Mr. Shorter about his testimony given at the October 2, 2013 preliminary hearing. At the preliminary hearing, Mr. Shorter stated that he was at the corner of Wister Street and Germantown Avenue. [N.T. 10/28/2014, pp. 162-63]. Defendant also questioned Mr. Shorter about why Mr. Shorter testified at the preliminary hearing that he first saw the Defendant on Wister Street and testified on direct examination that he first saw Defendant when Defendant was crossing Germantown Avenue near the corner of Germantown Avenue and Manheim Street, approaching the decedent who was sitting on the wall to the Wister Street Plaza. [N.T. 10/28/2014, pp. 163-64]. Defendant also questioned Mr. Shorter regarding Mr. Shorter's testimony on direct examination where Mr. Shorter stated that Defendant first shot the decedent while the decedent and Defendant were already on Wister Street. [N.T. 10/28/2014, pp. 162-67]. Defendant asked Mr. Shorter why he had told detectives that Defendant first fired shots while the decedent was on Germantown Avenue walking toward Wister Street. [N.T. 10/28/2014, pp. 174-75]. Mr. Shorter stated that the two streets intersect and he did not differentiate the two as being distinct because the incident initially occurred at or near the corner. [N.T. 10/28/2014, pp. 174-75, 195-96, 198-200] (stating

6 | P a g e

that when the decedent got off the wall and started to walk away from Defendant, Defendant started shooting at the decedent right before the decedent turned down Wister Street).

Defendant focused a good deal of his questions on several other inconsistencies with Mr. Shorter's account of the details of the shooting. [N.T. 10/28/2014, pp. 167-92]. Mr. Shorter testified at trial that Defendant had a black revolver but that he could not remember the clothes Defendant was wearing that night. [N.T. 10/28/2014, pp. 167-70]. During the preliminary hearing, Mr. Shorter stated that he could not see the color of the gun, but testified that Defendant was wearing a black hoodie which covered Defendant's dreadlocks. [N.T. 10/28/2014, pp. 167-69]. Mr. Shorter also stated that the decedent was sitting on the Wister Street Plaza wall alone when Mr. Shorter walked up the block. [N.T. 10/28/2014, pp. 170-73].

During cross-examination, Mr. Shorter used reference points within the courtroom to estimate how far he was from the decedent and Defendant when the shooting occurred. [N.T. 10/28/2014, pp. 186-89]. Using certain reference points within the courtroom, Mr. Shorter testified that he stood roughly 35 feet from the decedent and 16 feet from Defendant when Defendant removed the weapon and fired the first shots on Wister Street. [N.T. 10/28/2014, pp. 186-89].

Defendant's last line of questioning centered on the *alleged* extortion attempts. [N.T. 10/28/2014, pp. 182-86, 191-92]. As this issue touches on two of Defendant's assignments of error, the following excerpt took place regarding the extortion attempts:

> Q: This is what you said at the preliminary hearing on page 28.
> Question. I will start at line 11.
> Did anyone approach you and tell you why they need the money?
> Your answer. Did anyone approach me telling me why they needed the money?
> Question. Right. Why you need to give up the money?
> Your answer. I guess because they was trying to make – I don't know. Just to make me give money up just because I was a rat or something. I don't know. I don't know if they – I don't know if they heard something. I don't know.

You recall being asked that question and giving that answer that you didn't know why you were asked to give up money?

A: No.

Q: You don't recall that?

A: No.

Q: Next question. Was there a dollar amount?
Do you remember that?

A: Yes.

Q: And what was the dollar amount?

A: Initially they said 12 hundred.

Q: Initially they said 12 hundred.
You were asked on page 29, question, was there any dollar amount ever talked about? Five hundred or two thousand? Was there a dollar amount talked about in terms of what you had to give this man?
Your answer. Four hundred and fifty dollars.
Question. Four hundred fifty?
Answer. Four hundred and fifty dollars.
And you told that to the detective too; is that correct?
Answer. Four hundred and fifty.
Question. I'm sorry. Did you tell that to the detective when you gave the statement on the 11th?
Your answer. I believe so.
You call [sic] being asked that questions and giving those answers, sir?

A: Yes.

Q: Did you tell the detective that the amount of money was four hundred and fifty dollars?

A: No. Not initially.

Q: At any time did you tell the detective that the amount of money was four hundred and fifty dollars?

A: Yes.

Q: And he wrote it down in your statement?

A: Yes.

Q: You have your statement in front of you?

A: (no response)
COMMONWEALTH: Could we direct the witness to page three, first full question and answer?

Q: Question – No. Statement. 42, Page 3.
First question. You see that first question, how much money did Keith tell you he wanted?

A: Yes.

Q: All right. And what did you tell the detective?

A: 12 hundred.

Q: Is there any mention of four hundred fifty dollars in that statement?

A: No.

. . . .

Q: And, sir, you waited almost two months after this incident before you went and told the police your story; is that correct?

A: Yes.

Q: You recall testifying at the preliminary hearing on page 25, line 16, question, all right, how long after that conversation did you give a statement to the detective about what you claim you saw?
Your answer. I gave the statement as soon as I got scared, as soon as he told me, as soon as he said that I had to give up money, that's when I called 911.

Question. That same night or the next day?

Answer. Next day. I said the following day.

Question. So I believe the shooting occurred on July 18th of 2013; correct?

COMMONWEALTH: I'm going to object for the moment, Your Honor.

COURT: Let me see you at sidebar.

(A sidebar discussion was held off the record.)

COURT: Just for the record, I'm going to sustain the Commonwealth's objection to this particular line of questioning. So let's move on.

[N.T. 10/28/2014, pp. 183-85, 191-92]. After Mr. Shorter's testimony concluded, both attorneys and this court discussed the Commonwealth's objection which this court sustained. [N.T. 10/28/2014, pp. 203-05]. In sum, Defendant's questioning conflated two separate extortion attempts into one, in part because the testimony at the preliminary hearing did not clearly compartmentalize which incident was being referenced through the question that was asked. [N.T. 10/28/2014, pp. 204-05]. The first extortion attempt, an interaction between Defendant and Mr. Shorter, occurred a week after the murder. [N.T. 10/28/2014, p. 204]. The second attempt, which involved Keith Williams, an acquaintance of Defendant, occurred on September 11, 2013. [N.T. 10/28/2014, p. 204]. The Commonwealth's objection focused on Defendant's impeachment by reading the preliminary hearing notes of testimony and not on the line of questioning itself. [N.T. 10/28/2014, pp. 204-05]. This court sustained the objection because the line of questioning was confusing the jury to the point that the jury may not have understood the difference between the two incidents. [N.T. 10/28/2014, p. 205]. In response, Defendant argued that he should have been entitled to ask the questions and that the onus should have been on the prosecution to clarify any confusion or issues through redirect examination, by rehabilitating the witness. [N.T. 10/28/2014, p. 205].

Shahere Jackson-McDonald also testified as an eyewitness to the murder. [N.T. 10/29/2014, pp. 78-97]. On the night in question, Ms. McDonald had just left her mother's residence and was standing at the corner of Manheim Street and Germantown Avenue waiting for a bus. [N.T. 10/29/2014, pp. 78-83]. At that corner, there are two establishments—a pharmacy and the Sugar Stick Bar—each occupying a corner on either side of Manheim Street. [N.T. 10/29/2014, pp. 78-83]. Ms. McDonald was positioned on the corner in front of the

pharmacy. [N.T. 10/29/2014, pp. 79-81]. Ms. McDonald testified that she saw the Defendant walking down Germantown Avenue on the opposite side of the street. [N.T. 10/29/2014, pp. 79-83]. Ms. McDonald stated that Defendant was walking down Germantown Avenue before he crossed the street to the side where she was standing. [N.T. 10/29/2014, pp. 79-83]. Ms. McDonald testified that the Defendant came within five feet of her before crossing back over Germantown Avenue to approach three boys who were standing near the wall to the Wister Street Plaza. [N.T. 10/29/2014, pp. 82-84]. According to Ms. McDonald, as Defendant was crossing back over Germantown Avenue toward the three males standing by the Wister Street Plaza, he pulled out a gun and started shooting. [N.T. 10/29/2014, p. 83]. Immediately, all the males near the Wister Street Plaza wall disbanded. One of the males ran down Germantown Avenue and turned left onto Wister Street. [N.T. 10/29/2014, pp. 83-86]. According to Ms. McDonald, the Defendant followed that male, later determined to be Gregory Smith, and shot him on Wister Street. [N.T. 10/29/2014, pp. 83-86]. Ms. McDonald hid underneath a car and waited fifteen minutes for the bus to arrive. [N.T. 10/29/2014, pp. 83-84]. Once the bus arrived, Ms. McDonald crawled out from her position under the vehicle and took the bus home. [N.T. 10/29/2014, pp. 83-84].

The next day, Ms. McDonald spoke to Sylvester Mitchell by phone. [N.T. 10/29/2014, pp. 89-92]. Mr. Mitchell told Ms. McDonald about the grief his family was dealing with over the death of a family member. [N.T. 10/29/2014, p. 90]. Ms. McDonald then described the location of and timing of the murder she had witnessed. [N.T. 10/29/2014, pp. 90-91]. Mr. Mitchell told Ms. McDonald that she needed to speak to detectives about what she had seen. [N.T. 10/29/2014, pp. 90-91]. Detectives later met Ms. McDonald at her home. [N.T. 10/29/2014, pp. 147-55]. She told them what she had seen. [N.T. 10/29/2014, pp. 149]. Ms. McDonald agreed to give a formal statement at the homicide division on July 24th. [N.T. 10/29/2014, pp. 89-96, 149-55].

Both witnesses testified that Defendant's hair style was different at trial compared to his hair style on the night of the murder. [N.T. 10/29/2014, pp. 83-85, 93-94]; [N.T. 10/28/2014, pp. 127-28]. Ms. McDonald stated that she had never seen Defendant prior to that night, but also described a tattoo located on Defendant's neck which she noted as Defendant passed her. [N.T. 10/29/2014, pp. 84, 88-89].

## Other Evidence

Officer Lamont Fox, of the Philadelphia Crime Scene Unit, arrived at the crime scene at or about 1:30am. [N.T. 10/28/2014, pp. 207-10, 12]. Along with his partner, Officer Clyde Frasier, Officer Fox secured the scene, one block up from Wister Street and Germantown Avenue to the corner of Manheim Street and Germantown Avenue and one block down Wister Street, encompassing the area (and more) around which the decedent was found on the sidewalk. [N.T. 10/28/2014, pp. 209-11]. Officer Fox testified that four fired cartridge casings were recovered and one strike mark was found in a building located at the corner of the Wister Street and Germantown Avenue intersection, on the opposite side of Wister Street from the Wister Street Plaza. [N.T. 10/29/2014, pp. 9-15, 17-18]. The four fired cartridge casings were found in the space from the Germantown Avenue sidewalk near the wall to the Wister Street Plaza to the location of the decedent on Wister Street. [N.T. 10/29/2014, pp. 11-18]. The first two fired cartridge casings were spaced from each other by some distance down the sidewalk just outside the Wister Street Plaza. [N.T. 10/29/2014, pp. 11-18]. The remaining two fired cartridge casings were concentrated in proximity to the decedent's body found on Wister Street. [N.T. 10/29/2014, pp. 28-30]. Officer Fox testified that the distance from the opposite corner of Wister Street and Germantown Avenue to the decedent's body was 121 feet, 6 inches. [N.T. 10/29/2014, pp. 22-23].

Relying on one of the photographs taken that night, Officer Fox stated that a person standing where the decedent was resting on the Wister Street sidewalk could not see the corner

of Reger Street and Germantown Avenue; obstructing the view was a building at the corner of Wister Street and Germantown Avenue—the building which had the strike mark which the crime scene officers found during their investigation. [N.T. 10/29/2014, pp. 22-26]. According to Officer Fox, the strike mark was associated with this incident because the markings indicated that the building had just been impacted and fine granules of paint or dirt were still present directly below the impact point on the ground. [N.T. 10/29/2014, pp. 21-22]. Relying on a scaled map prepared of the area, Officer Fox estimated that the distance between the corner of Reger Street and Germantown Avenue to the corner of Wister Street and Germantown Avenue is approximately fifty (50) feet. [N.T. 10/29/2014, p. 31]. All four fired cartridge casings were analyzed and were determined to have been fired from the same weapon.[5] [N.T. 10/30/2014, pp. 13-17].

Officer Frederick Clough testified that he and Officer Weston (first name not given) responded to the 12:15am radio call relayed by police dispatch. [N.T. 10/29/2014, pp. 38, 43]. Officer Clough testified that upon his arrival, the decedent was severely injured and unresponsive. [N.T. 10/29/2014, p. 39]. Along with testifying regarding the steps he and Officer Weston took to secure the scene, Officer Clough, an officer in that district for eleven years, testified that there was an opening in the fence located in the back of the Wister Street Plaza; the opening was not repaired as of the date of the incident or for the entire time he has been on patrol in that district. [N.T. 10/29/2014, pp. 35-36, 49-52]. Officer Clough stated that a person could easily exit through the opening in the fence to access Collum and Lena Streets. [N.T. 10/29/2014, p. 50].

---

[5] Officer Gregory Welsh, of the Firearms Identification Unit for Philadelphia, was admitted as an expert in the field of ballistics and firearm identification. [N.T. 10/30/2014, pp. 12-13].

Dr. Sam Gulino, Chief Medical Examiner for the City of Philadelphia, was admitted as an expert in forensic pathology. [N.T. 10/29/2014, pp. 56, 56-76]. Dr. Gulino testified that an Associate Medical Examiner, Dr. Edwin Lieberman, conducted the autopsy and prepared the report regarding his findings. [N.T. 10/29/2014, pp. 59-60]. After a full review of the entire file and the final report prepared by Dr. Lieberman, Dr. Gulino agreed with the conclusions reached by Dr. Lieberman. [N.T. 10/29/2014, pp. 61-62].

According to Dr. Gulino, the decedent's cause of death was a gunshot wound to the chest and the manner of death was homicide. [N.T. 10/29/2014, pp. 63]. Dr. Gulino stated that the decedent suffered three gunshot wounds—one to the upper left back, one to the left buttock, and one to the right front part of the chest. [N.T. 10/29/2014, p. 62]. The projectile which penetrated the right front part of the chest hit the sternum and broke the breast bone, and the broken breast bone caused a tearing of the pericardial sac surrounding the heart; this injury proved to be the fatal injury. [N.T. 10/29/2014, pp. 62, 67-69]. During the autopsy, two bullet jackets were retrieved from the decedent's body and were sent to the Firearm Identification Unit for analysis.[6] [N.T. 10/30/2014, pp. 17-21].

Police Officer Anthony Comitalo testified regarding a September 11, 2013 radio call that occurred at 1:50pm regarding an incident involving a person with a gun. [N.T. 10/29/2014, p. 115]. Officer Comitalo arrived to the corner of Ogontz and Olney Avenues. [N.T. 10/29/2014, pp. 115]. Kyron Shorter approached Officer Comitalo, who asked Mr. Shorter general questions about who had the gun and whether that person was threatening Mr. Shorter. [N.T. 10/29/2014, pp. 115-16]. Officer Comitalo described Mr. Shorter's demeanor as nervous and upset to the point

---

[6] Officer Welsh testified, *see supra* note 5, that both bullet jackets were fired from the same weapon. [N.T. 10/30/2014, pp. 19-21]. Officer Welsh could not definitively say that the bullet jackets and the fired cartridge casings were from the same weapon, but could say that the fired cartridge casings were forty caliber Smith and Wesson and that the bullet jackets were either forty caliber Smith and Wesson or ten millimeter. [N.T. 10/30/2014, pp. 20-22].

that Mr. Shorter was shaking. [N.T. 10/29/2014, p. 121]. At the scene, Mr. Shorter told Officer Comitalo that two men in a Jeep Cherokee had threatened him with a gun. [N.T. 10/29/2014, pp. 115-16]. Once Officer Comitalo transported Mr. Shorter back to the police station, Mr. Shorter stated that he had information regarding the July murder of Gregory Smith and that knew the person who committed the murder by the name "Dai." [N.T. 10/29/2014, pp. 116-22]. The following exchange occurred on direct examination:

Q:    So I'm going to ask you a couple of questions about what [Mr. Shorter] told you.

First I want to direct your attention to why Mr. Shorter called the police and had asked for help that day in terms of the Cherokee.

Did he tell you who was in the Cherokee and what that person had either said to him or did to him?

A:    Initially at location, no, but eventually, yes.

Q:    And what did he say about that individual?

DEFENSE:    I would object.

COURT:    Overruled

A:    He said that it was a male that he knew by the name of Dai and he was –

DEFENSE:    Objection.

COMMONWEALTH: If I can, I will give the officer his interview.

DID he tell you basically – Let me clarify –

DEFENSE:    I move for mistrial.

COURT:    We can deal with that not at this particular moment.

I'm going to suggest that you do a little leading.

[N.T. 10/29/2014, pp. 117-18]. Officer Comitalo stated that Mr. Shorter informed him that he had information regarding this murder, that people were extorting money from him because of what

he saw or knew regarding this murder, and that a gentleman by the name of Keith was the person inside the Jeep Cherokee. [N.T. 10/29/2014, pp. 119-22]. According to Officer Comitalo, police searched for a Jeep Cherokee with an individual named Keith within, but the police were not able to find the vehicle or the suspect. [N.T. 10/29/2014, p. 122].

This court handled Defendant's motion for a mistrial in the robing room and outside the presence of the jury. [N.T. 10/29/2014, pp. 125-28]. The Commonwealth argued that Officer Comitalo's testimony regarding the Jeep Cherokee was cut short after Officer Comitalo started saying that the person who was in the vehicle was Dai, Defendant's nickname. [N.T. 10/29/2014, pp. 125-28]. The Commonwealth argued that the testimony did not imply that the Defendant was present in the Jeep Cherokee with a gun hours before Mr. Shorter gave his statement to Officer Comitalo. [N.T. 10/29/2014, p. 126]. In an abundance of caution, the Commonwealth argued that should the testimony require clarification, this court could issue a curative instruction to the jury stating that there was no evidence, physical or testimonial, that there was a gun shown or displayed on September 11th in the Jeep Cherokee. [N.T. 10/29/2014, pp. 11-18]. After this court denied the motion for mistrial, Defendant requested that a curative instruction also be given to the jury stating that there is no evidence that the Defendant was present in the vehicle. [N.T. 10/29/2014, pp. 127-28]. This court issued the jury a cautionary instruction informing them that there was no evidence that a gun was present or shown to Mr. Shorter by the males in the Jeep Cherokee on September 11th and that there was no evidence that the Defendant was present in the Jeep Cherokee. [N.T. 10/29/2014, pp. 128-29].

Detective Joseph Bamberski, the assigned detective for this case, testified that no eyewitnesses came forward at the scene or within the days following the murder. [N.T. 10/29/2014, pp. 140-47]. Detectives Morton and Leahy interviewed the decedent's cousin, Ditavious Smith, on July 19th. [N.T. 10/29/2014, pp. 144-45]. Mr. Smith told the detectives to

contact a close family friend, Sylvester Mitchell, whom he believed to have information regarding the murder. [N.T. 10/29/2014, pp. 147-48]. Detectives spoke to Mr. Mitchell at Mr. Mitchell's residence. [N.T. 10/29/2014, pp. 148-49]. Mr. Mitchell directed the detectives to Shahere Jackson-McDonald, an eyewitness to the murder, and provided detectives Ms. McDonald's cell phone number. [N.T. 10/29/2014, p. 149]. Detectives called Ms. McDonald and asked to speak to her at her residence. [N.T. 10/29/2014, p. 149]. After the detectives spoke to Ms. McDonald, Ms. McDonald consented to accompanying the detectives to the homicide division where they conducted an interview. [N.T. 10/29/2014, pp. 149-55]. Ms. McDonald told officers that she had seen the murder, provided details of the incident, and identified Defendant as the shooter from a photo array of eight pictures. [N.T. 10/29/2014, pp. 150-55].

Based on this information, on the evening of July 22, 2013, Detective Donald Marano found Defendant and transported him to the homicide unit. [N.T. 10/29/2014, pp. 130-31]. During the early afternoon of July 23, 2013, Detective Marano prepared a biographical summary of the Defendant which included, *inter alia*, a description of a tattoo on Defendant's neck. [N.T. 10/29/2014, pp. 133-34]. Detective Marano asked Defendant for his cell phone, for the cell phone number associated with the cell phone and for permission to search the phone. [N.T. 10/29/2014, pp. 135-36]. Along with turning over and consenting to a search of his phone, Defendant also signed a Consent-to-Search document for Detective Marano. [N.T. 10/29/2014, pp. 136-37]. Defendant also told Detective Marano that the cell phone was his cell phone and the one which he used. [N.T. 10/29/2014, p. 137]. Detective Marano placed the phone on a property receipt and delivered it to Detective Bamberski. [N.T. 10/29/2014, pp. 137-38].

Detective Bamberski testified that he received the cell phone and accompanying documentation from Detective Marano and had another detective, Detective Graf (first name not given), prepare a search warrant for the cell phone. [N.T. 10/29/2014, pp. 155-56]. After the

search warrant was approved, Detective Bamberski served the search warrant on T-Mobile for call-detail records for that cell phone spanning the time period of July 16, 2013 to July 23, 2013. [N.T. 10/29/2014, pp. 157-59]. The resulting call-detail records provided by T-Mobile were initially reviewed by an internal department expert, Detective Dunlap (first name not given), before being sent to the FBI's specialist, Agent William Shute, for certification. [N.T. 10/29/2014, pp. 157-59].

On September 11, 2013, Detective Bamberski interviewed Mr. Shorter. [N.T. 10/29/2014, pp. 159-60]. Detective Bamberski presented Mr. Shorter a photo array containing Defendant's picture. [N.T. 10/29/2014, pp. 159-60]. Mr. Shorter identified Defendant as the perpetrator; detectives then arrested Defendant pursuant to an arrest warrant. [N.T. 10/29/2014, pp. 160-64].

During cross-examination, Detective Bamberski was questioned about the call-detail records and the name officially associated with the account. [N.T. 10/29/2014, pp. 168-69]. Detective Bamberski testified that this cell phone and cell phone number were associated with Dawn Heyward, Defendant's mother. [N.T. 10/29/2014, pp. 169]. On redirect, Detective Bamberski testified that he had spoken to Dawn Heyward on July 19, 2013; during that interview, Ms. Heyward informed Detective Bamberski of the numbers to the cellular phones that belong to her and to the decedent, Gregory Smith; the numbers to the cellular phones that Mr. Heyward and Gregory Smith owned were distinct from the number the Defendant told Detective Marano belonged to him. [N.T. 10/29/2014, pp. 171-74].

Detective Frank Mullen testified regarding the steps taken to search the vicinity of the crime scene for video surveillance. [N.T. 10/30/2014, pp. 35-54]. The search uncovered two surveillance videos which were recording the exterior of the Germantown Pharmacy, which is located at the corner of Germantown Avenue and Manheim Street, but neither camera was positioned to capture the shooter or the murder. [N.T. 10/30/2014, pp. 36-38]. Detective Mullen

testified that both videos showed Ms. McDonald walking in and out of the spectrum of the camera's recording area. [N.T. 10/30/2014, pp. 39-49]. Detective Mullen identified Ms. McDonald as the person pacing in and out the camera's eye. [N.T. 10/30/2014, pp. 37-49]. Based on the size and quality of the video, Detective Mullen identified Ms. McDonald each time she reappeared on the video and described the angle of the camera for the jury after each short portion of the surveillance was played. [N.T. 10/30/2014, pp. 41-49]. Defendant objected to the form of the testimony and argued that the video spoke for itself. [N.T. 10/30/2014, p. 45]. This court allowed the testimony to proceed; Defendant raises this ruling as his sixth issue in his Statement of Matters Complained of on Appeal.

Detective Mullen also testified about the documentation which he received from a member of the District Attorney's Office who conducted a forensic examination of Defendant's cellular phone. [N.T. 10/30/2014, pp. 53-56]. The forensic examination of the phone's exported stored data from the cellular phone which Defendant had turned over to Detective Marano on July 23rd. [N.T. 10/30/2014, pp. 52-55]. Part of the stored information included numerous images of Defendant with other young males wearing "Brickyard" t-shirts[7] and numerous pictures of young females in varying states of undress. [N.T. 10/30/2014, p. 55].

William Shute, a Special Agent with the Federal Bureau of Investigation's Cellular Analysis Survey Team, was qualified as an expert in historical cell site analysis. [N.T. 10/30/2014, pp. 82-92]. Agent Shute testified that call-detail records, such as the ones provided by Detective Bamberski, resemble an individual's cell phone bill, with several additions and variations. [N.T. 10/30/2014, pp. 97-98]. Agent Shute stated that call-detail records list the date and time of a call, the originating cellular phone number, the terminating (or receiving) cellular

---

[7] The area where this incident took place is known as the "Brickyard" by the residents of that community.

phone number, and the duration of the call—all features common to an individual's monthly cellular phone statement. *Id.* The variations or additions found in a set of call-detail records include a series of columns which provide location information regarding the cellular tower to which the cellular phone connects when a call is initiated and the tower last used when the call terminates. [N.T. 10/30/2014, pp. 98, 102-03].

Agent Shute conducted an analysis of the call-detail records which T-Mobile supplied in response to Detective Bamberski's subpoena. [N.T. 10/30/2014, pp. 94-124]. The call-detail records were for the cellular phone number of the phone Defendant had given to Detective Marano. [N.T. 10/30/2014, pp. 97-99]. Defendant's cellular phone made or received calls several calls between 11:38pm and 12:19am on the night in question. [N.T. 10/30/2014, pp. 107-11]. Through the progression of phone calls, the cellular phone utilized two towers within the general vicinity of the murder. [N.T. 10/30/2014, pp. 107-11]. Furthermore, several of the calls which were analyzed occurred one to three minutes apart from each other, but the call-detail records listed the two towers as the originating and the terminating cell site location. [N.T. 10/30/2014, pp. 110-12]. Agent Shute testified that cell tower signals generally have a range of overlap and that cellular phones will constantly search and move from tower to tower where the phone "believes" it will get the strongest signal. [N.T. 10/30/2014, pp. 107-09]. Agent Shute concluded that the activity of the cellular phone over this short period of time between two overlapping coverage areas from cell site towers would be indicative of the phone making or receiving calls at or near the area of overlap between the coverage areas of the cell site towers. [N.T. 10/30/2014, pp. 110-12]. The overlapping coverage areas of the cell site towers which Defendant's phone used covered the area where the murder took place. [N.T. 10/30/2014, pp. 123-24].

ANALYSIS

Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial was insufficient to establish that he committed the crime of murder of the first degree as well as all the attendant firearms charges of which he was convicted.[8] After a review of the entire record, this court finds this claim meritless.

The standard for reviewing whether the conviction was based on sufficient evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond reasonable doubt. *Commonwealth v. Lewis*, 2006 PA Super 314, 911 A.2d 558, 563-64 (Pa. Super. Ct. 2006). When reviewing the evidence adduced at trial, the court may not weigh the evidence and substitute its judgment for that of the fact-finder. *Commonwealth v. Derr*, 841 A.2d 558, 560 (Pa. Super. 2004). It is for the fact-finder to determine any doubts regarding the Defendant's guilt. If the facts relied on by the fact-finder are so weak or inconclusive that, as a matter of law, no probability of fact may be drawn from the circumstances, then the conviction in question cannot stand. *Commonwealth v. Kim*, 888 A.2d 847, 851-52 (Pa. Super. 2005), *appeal denied*, 587 Pa. 721, 899 A.2d 1122 (2006) (quoting *Commonwealth v. Lehman*, 820 A.2d 766, 772 (Pa. Super. 2003) (citations omitted)). To sustain the conviction, the facts and circumstances relied on by the Commonwealth, as was the case at trial, must show

---

[8] Defendant was charged and convicted of murder of the first degree, carrying a firearm without a license, carrying a firearm on public streets, and possessing an instrument of crime. [N.T. 10/28/2014, pp. 36-37]; [N.T. 11/03/2014, pp. 4-9]. A self-authenticating record from the Pennsylvania State Police stating that the Defendant did not have a license to carry a weapon in Pennsylvania was presented before the jury. [N.T. 10/29/2014, pp. 176-77].

that each and every essential element is established beyond reasonable doubt. *See Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa. Super. 2000), *appeal denied*, 563 Pa. 683, 760 A.2d 851 (2000); *Commonwealth v. Gooding*, 818 A.2d 546, 549 (Pa. Super. 2003), appeal denied, 575 Pa. 691, 835 A.2d 709 (2003). While guilt may never rest upon conjecture or surmise, a conviction may stand on circumstantial evidence. *Commonwealth v. Roscioli*, 454 Pa. 59, 62, 309 A.2d 396, 398 (1973) ("Although the Commonwealth does not have to establish guilt to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence, the conviction must be based on more than mere suspicion or conjecture."); *see also Commonwealth v. Adams*, 254 Pa. Super. 62, 64, 385 A.2d 525, 526 (1978). It is sufficient if the circumstances are consistent with criminal activity even though they might likewise be consistent with innocent behavior. *Commonwealth v. LaRue*, 381 Pa. 113, 112 A.2d 362 (1955); *Commonwealth v. Gibson*, 201 Pa. Super. 573, 193 A.2d 690 (1965).

*First Degree Murder*

To support a conviction for first-degree murder, the Commonwealth must prove: (1) that the Defendant acted with the specific intent to kill; (2) that Gregory Smith was unlawfully killed; and (3) that the Defendant committed the killing. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 233–34 (1999). The *mens rea* here is the specific intent to kill, and is the factor that distinguishes first-degree murder from lesser-graded crimes of murder. The use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. The Commonwealth also has the ability to prove the Defendant's intent through circumstantial evidence. *Commonwealth v. Anderson*, 538 Pa. 574, 650 A.2d 20, 24 (1994); *Commonwealth v. Packard*, 767 A.2d 1068, 1071 (Pa. Super. Ct. 2001), *appeal denied*, 566 Pa. 660, 782 A.2d 544 (2001).

A full review of the evidence presented at trial shows that sufficient evidence existed to prove that Defendant was the perpetrator of Gregory Smith's murder. Two eyewitnesses, Mr. Shorter and Ms. McDonald, saw Defendant chase the decedent down Germantown Avenue and turn onto Wister Street before Defendant immobilized the decedent with the shots fired from Defendant's weapon. Although the witnesses saw the same murder from differing vantage points, both testified that Defendant pulled out a weapon, chased Gregory Smith down Germantown Avenue, and finally shot the decedent on Wister Street.

Furthermore, significant evidence existed to establish that Defendant committed the murder with the specific intent to kill, the *mens rea* necessary for murder of the first degree. Ms. McDonald testified that Defendant, after crossing Germantown Avenue toward her and the Sugar Stick Bar, crossed back over Germantown Avenue toward the decedent once he saw the decedent by the Wister Street Plaza. Ms. McDonald also stated that the decedent was near the Wister Street Plaza with three other males. Once Defendant crossed toward the group and removed the weapon, all the males, including the decedent, scurried in multiple directions, but Defendant chased down only the decedent. Furthermore, Mr. Shorter testified that Defendant shot the decedent twice, ran away through a breezeway through the Wister Street Plaza before coming back to ensure the decedent's demise: he fired three more shots while the decedent lay squirming on the pavement. Corroborating the testimony of both witnesses that Defendant was the shooter, Defendant's own phone was utilizing towers within the vicinity at the time of the murder. Clearly, the evidence was sufficient to justify the verdict.

*Voluntary Manslaughter*

Within Defendant's 1925(b) statement, Defendant's last assignment of error alleges that this court erred when it denied Defendant's request to have the jury instructed on voluntary manslaughter. Given how the following analysis relies mainly on the lack of any evidence that

this killing was committed with anything but the specific intent to kill, this court has decided to address this issue along with the prior sufficiency-of-the-evidence claim.

In *Commonwealth v. McCusker*, 448 Pa. 382, 389, 292 A.2d 286, 290 (1972), the Supreme Court held that a homicide defendant may rely "upon the cumulative impact of a series of related events" to establish adequate provocation to support a conviction for voluntary manslaughter. With regards to the claim that the jury should have instructed on voluntary manslaughter, the Pennsylvania Supreme Court has held that the trial court "shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. . . . Instructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury." *Commonwealth v. Browdie*, 543 Pa. 337, 349–50, 671 A.2d 668, 674 (1996); *see also Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328 (1983) (voluntary manslaughter charge is appropriate only when that crime is made an issue in the case, and evidence would support such a verdict).

The crime of voluntary manslaughter is codified at 18 PA.C.S. § 2503, which provides in relevant part:

(a) General rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

(b) Unreasonable belief killing justifiable.—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the

killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

In the instant case, this court declined to give a voluntary manslaughter instruction based on its determination that the evidence would not support such an instruction.

As stated above, Defendant went to the area of the Sugar Stick Bar – a bar known to be frequented by the decedent—armed with a weapon. After crossing Germantown Avenue toward the corner where the Sugar Stick Bar is located, Defendant saw the decedent on the opposite side of Germantown Avenue with three other males. Defendant changed course and made his way to the group, brandishing the weapon and opening fire on decedent as the decedent was fleeing for his life. The testimony also established that Defendant, upon immobilizing the decedent and after fleeing through the breezeway of the Wister Street Plaza, returned to the injured victim to assail three more shots into the injured and unarmed target.

The evidence does not establish voluntary manslaughter. Defendant's mother and the decedent were paramours, and defense counsel engaged several testifying witnesses in a line of questioning regarding the alleged violent relationship that may have existed between the two; not one witness confirmed that such a violent relationship existed. [N.T. 10/28/2014, pp. 81-85, 93-96] (stating that this witness, Diatavious Smith, never saw the decedent attack Defendant's mother).

The manner of the homicide also belies any heat of passion argument. Arriving at the scene already armed, Defendant sought out the decedent to kill him. Defendant made sure that the assault brought about the desired result by returning to the area where the injured victim lay writhing in pain to inflict the insurance damage to guarantee the victim's death. Both Defendant's method in seeking out the decedent and the manner in which the assault took place undermine any rational reliance that this murder was committed in any manner other than with

the specific intent to kill. To be clear, the method and manner of this murder were not done under some overwhelming heat of passion. A voluntary manslaughter charge "shall be given only when requested, where the offense has been made an issue in the case, and the trial evidence reasonably would support such a verdict. . . . The jury's discretion is better channeled under the rule set forth here to rational deliberation and decision of whether a defendant is guilty of a crime supported by the evidence." *Commonwealth v. Carter*, 502 Pa. 433, 443-44, 466 A.2d 1328, 1332-33 (1983).

## Weight of the Evidence

The Defendant next contends that a new trial should be granted because the verdict is against the greater weight of the evidence.

The weight given to the evidence is wholly within the province of the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Hunzer*, 868 A.2d 498, 506-507 (Pa. Super. Ct. 2005). Any motion for a new trial grounded in the contention that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Accordingly, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191-1192 (Pa. Super. Ct. 2004), *appeal denied*, 583 Pa. 689, 878 A.2d 864 (2005). Questions concerning inconsistent testimony go to the credibility of witnesses. *Commonwealth v. DeJesus*, 580 Pa. 303, 311, 860 A.2d 102, 107 (2004). The court cannot substitute its judgment for that of the jury on issues of credibility. *Id.* The decision whether to grant a new trial on this basis rests within the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751-52 (2000); *Commonwealth v. Hunter*, 381 Pa. Super. 606, 617,

554 A.2d 550, 555 (1989). A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, thus making the award of a new trial imperative so that what is right and just may be given another opportunity to prevail. *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-1156 (1986). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Widmer*, 744 A.2d at 752. Rather, the role of the trial court is to determine that, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice. *Id.*

After review, this court finds the claim meritless; the verdict assigned by the jury was not against the greater weight of the evidence. Notwithstanding the fact that both eyewitnesses were not the most detailed and articulate in their testimony, the jury clearly found their first-hand accounts to be credible. Both witnesses identified Defendant as the shooter. Both witnesses also saw Defendant chase down the decedent to Wister Street before finally killing him. The jury clearly believed that Defendant was present in the area of the murder during the murder as his call-detail records showed, according to Agent Shute. Although the cameras outside the pharmacy located at the corner of Manheim Street and Germantown Avenue did not capture an image of Defendant that night, the lack of an image of Defendant does not equate with Defendant's not being there. To the extent that Defendant asserts this claim to say that the two eyewitnesses, both admitted marijuana users, are not credible, credibility determinations are the province of the finder of fact, and this court will not reweigh the evidence.

Defendant claims that the witnesses were not in a position to see the crime. This claim distorts the record. Defense counsel tried to pin Mr. Shorter into a binary choice – was Mr.

Shorter on the corner of Germantown Avenue and Reger Street or Germantown Avenue and Wister Street. Multiple times, Mr. Shorter adamantly testified that he was *between* Wister Street and the Reger Street alley. Buttressing this testimony, counsel asked Officer Fox whether someone standing *at* the corner of Reger Street and Germantown Avenue would be able to see where the decedent was lying; Officer Fox stated that, based on the photo which is limited by the angle from which the lens captured the image, a person standing at that corner would not be able to see the decedent lying on the sidewalk. However, this obstructed view, unsupported by Mr. Shorter's own testimony, is not enough to discount entirely the witness' testimony. The jury was free to give its own assignment of weight to the testimony it received and none of the multitude of credibility issues Defendant relies on is sufficient to say that the jury's verdict was against the greater weight of the evidence.

### Extortion Attempts by Defendant and Keith Williams Against Mr. Shorter

The Defendant's next assignment of error relates to the trial court's pretrial evidentiary ruling which barred testimony relating to attempts by Defendant and Defendant's acquaintance, Keith Williams, to extort money from Mr. Shorter. This court ruled that, tentatively, the extortion attempts would be excluded unless the testimony was required for identification purposes or unless the door was opened. Defendant claims that the trial court erred in allowing the Commonwealth to present the testimony notwithstanding the pretrial ruling.

A motion in limine is a pre-trial application before a trial court made outside the presence of a jury, requesting a ruling or order from the trial court prohibiting the opposing counsel from referring to or offering into evidence matters so highly prejudicial to the moving party that curative instructions cannot alleviate an adverse effect on the jury. *Commonwealth v.*

*Padilla*, 2007 PA Super 130, ¶¶ 9-10, 923 A.2d 1189, 1193-94 (2007). The purpose of a motion in limine is two-fold: "1) to provide the trial court with a pre-trial opportunity to weigh carefully and consider potentially prejudicial and harmful evidence; and 2) to preclude evidence from ever reaching a jury that may prove to be so prejudicial that no instruction could cure the harm to the defendant, thus reducing the possibility that prejudicial error could occur at trial which would force the trial court to either declare a mistrial in the middle of the case or grant a new trial at its conclusion." *Commonwealth v. Padilla*, 2007 PA Super 130, ¶¶ 9-10, 923 A.2d 1189, 1193-94 (2007). Further, a ruling on a pre-trial motion in limine provides counsel with a basis upon which to structure trial strategy. For purposes of an appeal, the court's ruling on a motion in limine is the same as a pre-trial suppression order. *Commonwealth v. Padilla*, 2007 PA Super 130, ¶¶ 9-10, 923 A.2d 1189, 1193-94 (2007). "[A] pretrial suppression order is, in its practical effect, a final order ...." *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304, 308 (1963). "[T]he grant of a motion in limine ... is identical in effect, to a suppression order and characterized by identical indicia of finality." Bosurgi, 190 A.2d at 308. Accordingly, "Absent the introduction of new evidence that was unavailable before the [suppression/ in limine] ... hearing, a pre-trial ruling may not be reversed at trial." *Commonwealth v. Padilla*, 2007 PA Super 130, ¶¶ 9-10, 923 A.2d 1189, 1193-94 (2007) (quoting *Commonwealth v. Metzer*, 430 Pa. Super. 217, 230, 634 A.2d 228, 234 (1993)).

This issue is without merit. As the testimony of Mr. Shorter began, it became clear to this court that Mr. Shorter's two-month delay in reporting what he had seen was caused by the extortion attempts made by both Defendant and Defendant's acquaintance, Keith Williams. Mr. Shorter never spoke with authorities immediately after the July 18, 2013 murder. Rather, he remained silent. It was only after the second extortion attempt by Keith Williams that Mr. Shorter was motivated to call police and have police meet him at a corner outside the prying

eyes of the streets in his neighborhood so that he could detail what he had seen more than two months earlier. The evidence was clearly relevant. Without the evidence, the jury would have been left with no explanation regarding why Mr. Shorter waited nearly two months to detail to the authorities what he had seen firsthand. Accordingly, the trial court was justified in allowing the jury to hear this evidence. More reasons existed than the initial reasoning of identification made it necessary to allow the testimony regarding the extortion attempts. [N.T. 10/27/2014, pp. 212-24].

### Trial Court's Ruling Limiting Defendant's Cross Examination of Kyron Shorter

Next, Defendant challenges the trial court's ruling which prevented Defendant from cross-examining Mr. Shorter regarding discrepancies between Mr. Shorter's preliminary hearing testimony and his statement to detectives. Namely, the issue centers on the two extortion attempts. Even though Mr. Shorter had detailed on direct examination that two separate extortion attempts had been made, one by Defendant a week or so after the murder and a second by Keith Williams the day of Mr. Shorter's statement to detectives, the preliminary hearing testimony did not clearly delineate the two events by the questions which were asked. In sum, Defendant requests that this court allow Defendant to confound the jury through the confusing impeachment and leave it to the prosecution to unsully the waters through rehabilitation. This court finds no error in limiting the cross-examination on this line of questioning.

The Sixth Amendment guarantees a criminal defendant the right to confront witnesses against him, which includes the right to cross-examine witnesses. *Commonwealth v. Spiewak*, 533 Pa. 1, 10, 617 A.2d 696, 700 (1992). However, "It is well settled that it is within the discretion of the trial court to determine the scope and limits of cross-examination and that [an appellate court] cannot reverse those findings absent a clear abuse of discretion or an error of law."

*Commonwealth v. Whiting*, 447 Pa. Super. 35, 47, 668 A.2d 151, 157 (1995) (quoting *Commonwealth v. Nolen*, 535 Pa. 77, 82, 634 A.2d 192, 195 (1993)).

It is well-settled law that cross-examination directed toward revealing possible bias, interest or motive of a witness in testifying against the defendant is "always relevant as discrediting the witness and affecting the weight of his testimony." *Commonwealth v. Whiting*, 447 Pa. Super. 35, 47, 668 A.2d 151, 157 (1995) (quoting *Commonwealth v. Sullivan*, 485 Pa. 392, 395, 402 A.2d 1019, 1020 (1979)). It is within the sole province of the jury, as the finder of fact, to resolve the issue of a witness' credibility after such impeachment has been permitted. *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986). "It is not for the court to determine whether the cross-examination for bias would affect the jury's determination of the case." *Commonwealth v. Evans*, 511 Pa. 214, 225, 512 A.2d 626, 632 (1986). The jury carries this sword as the final arbiter of the witness' testimony. *Commonwealth v. Gentile*, 433 Pa. Super. 381, 387-89, 640 A.2d 1309, 1313-14 (1994).

Furthermore, the admission of evidence rests within the discretion of the trial judge. Any challenge to the evidentiary rulings made at trial will not be reversed absent a showing that the trial court abused its discretion. *Commonwealth v. Washington*, 63 A.3d 797, 805 (Pa.Super.2013). An abuse of discretion is found when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Commonwealth v. Martinez*, 917 A.2d 856, 859 (Pa.Super.2007).

As a general matter, this evidence did not lend to Mr. Shorter's bias, interest or motive. This line of questioning was meant to create confusion in the minds of the empaneled jury by characterizing Mr. Shorter as a liar or a witness who has been less than truthful. The very last

interaction between defense counsel and Mr. Shorter, prior to the objection, makes this conclusion abundantly clear. Relying on the preliminary hearing notes of testimony, counsel asked Mr. Shorter when he gave his statement to the detectives and Mr. Shorter responded that he contacted detectives the minute he became scared because of the extortion attempts. Reading the same notes of testimony, counsel read questions which asked when Mr. Shorter give his statement and Mr. Shorter replying, "the next day." Still reading the same notes of testimony, counsel read a question which clearly blurred the lines between two temporally spaced events: "So I believe the shooting occurred on July 18[th] of 2013; correct?" The reliance on these notes of testimony did nothing but create confusion by conflating two distinct incidents into one. Counsel's intended use of the preliminary hearing testimony was improper. Defendant was allowed to impeach the witness regarding any motive to fabricate or any bias on his part; the ruling merely prevented use of the preliminary hearing notes in a distorted fashion.

### Hearsay Statements made by Kyron Shorter to Officer Comitalo

The Defendant next argues that this court erred when it allowed Officer Comitalo to testify regarding statements made to him by Mr. Shorter regarding the second extortion attempt. By way of background, the second extortion attempt was made by Keith Williams, and there was testimony that two males, one being Keith Williams, were located in a Jeep Cherokee when this attempt occurred. Officer Comitalo testified to facts which were inaccurate, and the Commonwealth, after a sidebar conference, clarified the issue through the rest of Officer Comitalo's testimony. Furthermore, in denying Defendant's motion for a mistrial, this court issued a curative instruction (relying on both attorneys) which informed the jury that (1) there was no evidence that a weapon was in the Jeep Cherokee and (2) that there was no evidence that the Defendant was present in the vehicle.

The decision to grant the extreme remedy of a mistrial is a matter falling into the discretion of the trial court. *Commonwealth v. Boczkowski*, 846 A.2d 75, 94-95 (Pa. 2004). "A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." *Commonwealth v. Jones*, 668 A.2d 491, 503 (Pa. 1995).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *Commonwealth v. Cassidy*, 315 Pa.Super. 429, 462 A.2d 270 (1983); *Commonwealth v. Darden*, 311 Pa.Super. 170, 457 A.2d 549 (1983). Hearsay is generally inadmissible as evidence because the competency and veracity of the original speaker are not subject to examination. *Commonwealth v. Lewis*, 314 Pa.Super. 298, 460 A.2d 1149 (1983); *Commonwealth v. Perry*, 279 Pa.Super. 32, 420 A.2d 729 (1979). Thus the statement must be determined to be hearsay and then found to have no finely carved-out exception within the rules. However, evidence which would constitute inadmissible hearsay if offered for a certain purpose may be admitted for another purpose, subject to the duty of the trial court to give limiting instructions if requested. *See Commonwealth v. Johnson*, 457 Pa. 554, 327 A.2d 632 (1974).

This court finds no merit to this assignment of error. The jury is believed to follow the instructions of the trial court. Furthermore, this testimony did not have the prejudicial effect of denying Defendant a fair and impartial trial. The incorrect statement by Officer Comitalo was corrected by the Commonwealth through the remaining direct examination and was remedied by the curative instruction. Defendant was not denied his right to a fair and impartial trial, and the extreme remedy of a mistrial was not warranted.

## Detective Frank Mullen's Narration of the Videotape

The Defendant's last assignment of error alleges that this court erred when it allowed Detective Frank Mullen to narrate portions of the video obtained from the pharmacy located at the corner of Manheim Street and Germantown Avenue. Standing at this corner on the night in question was Ms. McDonald, who testified that she saw Defendant that night while she was waiting for a SEPTA bus and when shots began to ring out, Ms. McDonald ran and hid under a car. Based on the quality and size of the images on the video, this court allowed Detective Mullen to inform the jury when Ms. McDonald appeared within and leave the surveillance camera's eye. After a review of the record, this court finds no error in allowing Detective Mullen to be a conduit to the jury regarding the images shown on the two surveillance videos.

The trial judge is granted broad powers concerning the conduct of a trial. Any review of a trial court's decision regarding the course and conduct of a trial is measured for an abuse of discretion. *Commonwealth v. Niemetz*, 422 A.2d 1369, 1376 (Pa. Super. Ct. 1980). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Commonwealth v. Dengler*, 890 A.2d 372, 379 (Pa. 2005) (citing *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 560, 839 A.2d 1038, 1046 (2003)).

First and foremost, the video offered nothing but corroboration of Ms. McDonald's claim that she was at the scene when the shooting happened, and that she was at that corner as she stated she had been. It also verified her testimony regarding the fear that overtook her. The jury was free to assign Ms. McDonald's testimony its own weight regarding whether to believe all, part or none of her account of that night. The video did nothing to take the jury's credibility determinations away from them. Detective Mullen's "narrations" only told the jury, limited by the size and quality of the video when Ms. McDonald, in a frantic state, appeared in and

disappeared from the lens's eye. Detective Mullen did not narrate the video by describing Ms. McDonald as frantic or scared; he used no descriptive terminology which would have interfered with the credibility determination of the jury. Rather, Detective Mullen's "narration" simply told the jury that Ms. McDonald appeared in the video for a short time, ran out of the scope of the video's lens, and reappeared back into the area which the video was capturing. Detective Mullen did not usurp the jury's fact-finding function, and this court finds Defendant's claim to be meritless.

## CONCLUSION

After careful review of the record, the court finds no harmful, prejudicial or reversible error to justify the Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.